## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

JENNIFER PARTEN,       ]
                       ]
      **Plaintiff,**       ]
                       ]
**v.**                      ]     **CIVIL ACTION NO.**
                       ]     **2:18-cv-01579-KOB**
**ANDREW SAUL, Commissioner of Social**  ]
**Security,**                ]
                       ]
      **Defendant.**     ]

## MEMORANDUM OPINION

## I. INTRODUCTION

This social security case comes before a U.S. district court for the second time.

On March 18, 2011, the claimant, Jennifer Parten, applied for Supplemental Security Income under Title XVI of the Social Security Act. (R. 43). The claimant originally alleged a disability beginning on June 1, 2008 preventing her from employment, but then amended her alleged onset date to March 18, 2011. (R. 148, 579-80). The Commissioner denied her claim on June 27, 2011. (R. 95). The claimant then filed a timely request for and received a hearing before an Administrative Law Judge. (R. 103). The ALJ held the hearing on February 25, 2013. (R. 574).

On May 30, 2013, the ALJ denied the claim, finding that the claimant was not disabled under the Social Security Act and thus not entitled to social security disability benefits. (R. 40). The Appeals Council denied a subsequent request for review. (R. 22).

The claimant appealed the Commissioner's decision by filing suit in the United States District Court for the Middle District of Alabama on December 10, 2014. (R. 667). The district

1

court reversed and remanded the Commissioner's decision because the court found that substantial evidence did not support the ALJ's rejection of medical opinions in the record and the ALJ erred in not addressing the claimant's poverty status when finding the claimant's complaints to not be credible. (R. 681).

On remand, the ALJ held a second hearing on December 28, 2016. (R. 511). In a decision dated June 13, 2017, the ALJ again found that the claimant was not disabled and denied the claim. (R 489, 505). On August 8, 2018, the Appeals Council denied a subsequent request for review. (R. 477-79). Consequentially the ALJ's decision became the final decision of the Commissioner. *See Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). The claimant has exhausted her administrative remedies and this court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). For the reasons stated below, the court will reverse the Commissioner's decision and remand for further proceedings.

## II. ISSUES PRESENTED

The claimant presents the following issues for review:

1. Whether substantial evidence supports the ALJ's finding that the claimant's subjective complaints were not fully credible; and

2. Whether the ALJ properly considered and gave appropriate weight to the opinions and findings of the claimant's treating and examining physicians.

## III. STANDARD OF REVIEW

The standard for reviewing the Commissioner's decision is limited. The court must affirm the Commissioner's decision if the Commissioner applied the correct legal standards and if substantial evidence supports his factual conclusions. *See* 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir.

1987).

"No . . . presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker*, 826 F.2d at 999. The court does not review the Commissioner's factual determinations *de novo*. The court will affirm those factual determinations supported by substantial evidence. "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 402 (1971).

The court must keep in mind that opinions such as whether a claimant is disabled, the nature and extent of a claimant's residual functional capacity, and the application of vocational factors "are not medical opinions, . . . but are, instead, the opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability." 20 C.F.R. §§ 404.1527(d), 416.927(d). Whether the claimant meets the listing and is qualified for social security disability benefits is a question reserved for the ALJ, and the court "may not decide facts anew, reweigh the evidence, or substitute its judgment of that of the Commissioner." *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). Thus, even if the court were to disagree with the ALJ about the significance of certain facts, the court has no power to reverse that finding if substantial evidence in the record supports it.

The court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner]'s factual findings." *Walker*, 826 F.2d at 999. A reviewing court must not only look to those parts of the record that support the decision of the ALJ, but also must view the record in its entirety and consider evidence that detracts from the evidence on which the ALJ

relied. *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).

## IV. LEGAL STANDARD

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to social security disability benefits when the person is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." To determine whether a claimant meets the § 423(d)(1)(A) criteria, the Commissioner employs a five-step, sequential evaluation process:

(1) Is the person presently unemployed?

(2) Is the person's impairment severe?

(3) Does the person's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. pt. 404, subpart P, App. 1?

(4) Is the person unable to perform his or her former occupation?

(5) Is the person unable to perform any other work within the economy?

An affirmative answer to any of the above questions leads either to the next question, or, on step three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986).

When considering the credibility of the claimant's subjective statements of her symptoms, the ALJ must (1) determine if objective medical evidence shows that the claimant has a medical impairment reasonably capable of causing the symptom; and (2) evaluate the intensity and persistence of that symptom and determine the extent to which the symptom limits the individual's ability to perform work-related activities. 20 C.F.R. § 416.929; SSR 16-3p, 81 Fed. Reg. 14166, 14167-68 (Mar. 16, 2016).

In determining whether the claimant has a medically determinable impairment that could reasonably be expected to produce the individual's alleged symptoms, the Commissioner must find that the claimant demonstrated both an underlying medical condition and either "(1) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (2) that the objectively determined medical condition is of such a severity that it can reasonably be expected to give rise to the alleged pain." *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991). And the ALJ commits reversible error by discrediting the claimant's subjective complaints of pain without explicitly articulating his reasons for doing so. *Brown v. Sullivan*, 921 F.2d 1233, 1236 (11th Cir. 1991).

Generally, the ALJ must give more weight to medical opinions from treating and examining sources. 20 C.F.R. § 416.927(c)(1)-(2). If medically acceptable clinical and laboratory diagnostic techniques support a treating source's medical opinions and those opinions are not inconsistent with other substantial evidence in the case record, then the ALJ must give those opinions controlling weight. *Id.* The ALJ must give the medical opinions of treating physicians "substantial or considerable weight" unless good cause exists for not doing so. *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011). Good cause exists "'when the[] (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records.'" *Id.* (quoting *Phillips v. Barnhart*, 357 F.3d 1232, 1241 (11th Cir. 2004)). The ALJ does not commit reversible error if he articulates specific reasons for not giving a treating physician's opinion controlling weight and substantial evidence supports those reasons. *Moore v. Barnhart*, 405 F.3d 1208, 1212 (11th Cir. 2005).

# V. FACTS

As stated above, the claimant's case comes before a district court for the second time. In 2016, the Middle District of Alabama heard the claimant's appeal from an unfavorable ALJ decision denying her claim. The Middle District reversed and remanded the case. On remand, the ALJ issued another decision denying the claim. The claimant's appeal of this second decision now comes before the court.

The claimant was 37 years old at the time of the ALJ's 2016 decision. (R. 148, 505). The claimant has completed some college and has no past relevant work, though she briefly worked at a bank, daycare, and swimming pool. (R. 165, 503, 555-58). The claimant alleged disability based on her schizoaffective bipolar disorder, obsessive-compulsive disorder, and panic disorder. (R. 516). The claimant's record also indicates that she is obese and has problems with sleep apnea. (R. 215, 238, 327).

*Medical Record Before the 2013 ALJ Hearing*

The court looks first at the medical record before the first ALJ hearing held on February 25, 2013.

In 2008, the claimant saw Dr. Sterling Taylor after a referral from her primary care doctor. Dr. Taylor treated the claimant with psychotherapy and, in a report dated June 13, 2008, diagnosed her with bipolar I disorder, obsessive-compulsive disorder, and panic disorder. Dr. Taylor documented the claimant's depression and mania, rages, frequent thoughts of suicide, some thoughts of homicidal inclinations, panic attacks, and insomnia. Dr. Taylor also observed the claimant's "wishes for everything to be even," fear of germs, and obsession with death. In an associated letter dated April 15, 2011 to which he attached his report, Dr. Taylor recommended to the Disability Determination Service that the claimant was disabled because of her suicidal

behavior and mood disorders. (R. 358-60).

In June 2008, Dr. Atkins started treating the claimant as her psychiatrist. The claimant continued treatment with Dr. Atkins until June 2011. Dr. Atkins documented the claimant's schizoaffective bipolar disorder, OCD, panic disorder, and sleep apnea. He also recorded that the claimant continued to see Dr. Taylor throughout this time. (R. 301-16).

In September 2008, the Northport Medical Center admitted the claimant following a suicide attempt. NMC reported that the claimant attempted to overdose and cut her wrists. In October 2008, the claimant attempted to overdose again, and NMC admitted her and recorded her depression. (R. 210-41).

In the claimant's function report dated April 29, 2011, the claimant's husband at the time reported that the claimant regularly needed reminders to bathe, needed help with bathing, had an obsession with death, had panic attacks, often became nervous at new places, had concentration problems, could not be left alone for periods of time, and was bad with handling stress. He did report that the claimant was capable of preparing meals, taking care of her pets, and getting along with her family. (R. 176-83).

In June 2011, Dr. Jackson reviewed the claimant's record of impairments under the 2011 listings. She found that all paragraph B criteria did not rise above moderate. She also evaluated the claimant's RFC and found no more than moderate limitations in the understanding and memory category, sustained concentration and persistence category, social interaction category, and adaptation category. Dr. Jackson found that the claimant could understand, remember and follow short instructions, focus for two-hour periods, should have infrequent contact with public, could only have minimal changes in work routine, and should have only non-confrontational supervision and feedback. (R. 389-405).

In August 2012, Dr. Blanton conducted a consultative exam of the claimant. He found that the claimant had marked limitations in understanding, remembering, and carrying out complex instructions; marked limitations in making complex decisions; moderate limitations in interacting with the public and coworkers; marked limitations in interacting with supervisors; moderate limitations in responding to usual work situations; and mild limitations in following simple instructions and making simple decisions. Dr. Blanton also found that the claimant had borderline intellectual functioning, an IQ score of 70, distraction during testing, and a GAF score of 50. (R. 410-15).

In October 2012, the claimant received care at West Alabama Mental Health Center. The claimant reported severe anxiety, panic attacks, depression, auditory hallucinations, and passing suicidal thoughts. Her GAF score was 55. One month later, West Alabama recorded that the claimant adhered to her prescribed medication and saw moderate improvements in her symptoms. (R. 419-26).

In February 2013, Dr. Taylor submitted a Medical Source Opinion form. Dr. Taylor remarked that the claimant was highly variable in functioning and had extreme limitations in her ability to respond to work pressures, use judgment in detailed decisions, and maintain attention for periods of two hours. He also opined that the claimant had marked limitations in dealing with change in routine. He emphasized the absolute necessity of medication for the claimant to function. (R. 432-33).

Also in February 2013, during another appointment, West Alabama observed moderate improvement with the claimant's anxiety, hallucinations, and panic disorder, but only minimal improvement in her depression. (R. 435-36).

*The 2013 ALJ Hearing*

The ALJ held a hearing for the claim on February 25, 2013. (R. 575). Because this matter comes before the court on review of the 2016 decision, the court will discuss only the testimony relevant to the claimant's present appeal.

At the February 25, 2013 hearing, the claimant testified that she lived with her mom and brother. She stated that she regularly traveled to get groceries for her parents. The claimant expressed aspirations for finishing college online at the University of Phoenix by 2015 or being able to transfer to an on-campus university in the future. She stated that homework took a long time to complete because of her poor concentration skills. (R. 581-84).

The claimant testified that she quit her daycare job because she would have panic attacks while caring for newborns and infants. She testified that she had a job at a bank for approximately 6 months, but quit to attend college full-time. The claimant stated that she had taken care of her mother since 2012. The claimant stated that she did not manage her mother's medicine and that, after the claimant's overdose, the family kept all medicine locked up. The claimant also testified that she taught summer swimming lessons with two other instructors who ran the classes when she had panic attacks. (R. 585-91).

The claimant then mentioned that she spent most of her days at the pool and that she stopped taking her bipolar medication because it made her gain weight and feel like she had congestive heart failure. She mentioned that she started seeing doctors at West Alabama Mental Health for her mental health issues, especially after her hysterectomy. The claimant also said she could not carry more than 10 pounds. (R. 592-98, 603).

The claimant testified that, while studying, she often must reread material several times before she understands it and that she often relies on her online classmates for assistance. Most

of her days consisted of watching TV, helping her mother with her brother's assistance, doing chores, and completing online schoolwork. The claimant stated that she rarely left the house except to buy groceries or visit her brother in Birmingham. She also claimed that she took care of her pets. (R. 598-602).

When questioned by her attorney, the claimant testified that she had sleep apnea and other troubles with sleeping. She also testified that she saw Dr. Taylor regularly for her mental health issues since 2008 and that she frequently had panic attacks that lasted roughly five to fifteen minutes. She confirmed that she attempted suicide by overdose four times and that since then her family did not allow her access to her medication cabinet. (R. 602-08).

A vocational expert testified at the hearing and confirmed that jobs existed at the claimant's residual functional capacity. (R. 608-15).

### The 2013 ALJ Denial and the Middle District of Alabama's Reversal

On May 30, 2013, the ALJ issued his decision finding that the claimant did not have a disability under the Social Security Act. (R. 52). The ALJ held that the claimant had no relevant substantial gainful activity and that she had the severe impairments of bipolar disorder, personality disorder, obsessive-compulsive disorder, panic disorder, endometriosis, obesity, and asthma. (R. 45). The ALJ also held that the claimant did not meet any listing under step three of the five-step disability analysis. (R. 46).

The ALJ determined that the claimant had an RFC that prohibited her from returning to her past work, but that the claimant could find jobs in the economy with her impairments. (R. 48-51). Consequently, the ALJ denied the claimant's application for disability benefits. (R. 52). In his opinion, the ALJ afforded little weight to the opinions of treating physician Dr. Taylor and the consultative examining psychologist Dr. Blanton. He also discredited the claimant's

statements concerning the effects of her symptoms because her medication improved her symptoms and the record indicated that she could engage in her online school work and perform daily chores. (R. 49-50).

The Appeals Council denied the claimant's appeal of the ALJ's decision on October 27, 2014. (R. 22). Following the denial, the claimant filed suit in the U.S. District Court for the Middle District of Alabama alleging that (1) the ALJ erroneously failed to give significant weight to the opinion of the claimant's treating physician; (2) substantial evidence did not support the ALJ's decision to discredit the claimant's subjective testimony; and (3) the Appeals Council erred in refusing to vacate the ALJ's decision in light of new evidence. (R. 674).

The district court reversed and remanded the ALJ's decision because the ALJ did not articulate appropriate reasons for affording little weight to Dr. Taylor's and Dr. Blanton's opinions and erroneously failed to consider the claimant's lack of ability to pay for her medication. (R. 681).

*Medical Record Since Remand*

The claimant has expanded the record in her case since the Middle District of Alabama's decision.

In November 2013, the claimant began treatment with the UAB community psychiatry program's psychopharmacology clinic. During her diagnostic evaluation, she reported fleeting feelings of suicide, an obsession with death, and depression stemming from a miscarriage. She confirmed that she was writing a book on death. The claimant also mentioned that she still had auditory hallucinations, which she dealt with by listening to music. She reported anxiety, bipolar I disorder, sleep apnea, and stress from divorcing her husband. She received a prescription for Abilify. At a follow-up visit at the end of November 2013, she reported some improvement in

her mental state, and the doctors recorded that she had atypical bipolar affective disorder. The claimant also reported that Abilify made her feel sleepy and agitated and caused weight loss. Subsequently, UAB discontinued Abilify and prescribed Geodon. At her next follow-up appointment in December 2013, she reported similar problems with Geodon, and UAB switched her prescription to Latuda and Lamictal. (R. 828-39).

The claimant continued regular treatment at UAB with Dr. Rachel Julian through 2016. At her February 2014 appointment, Dr. Julian observed that the claimant's mood was "all over the place" and that the claimant had difficulty acquiring medication through her prescription assistance program. Dr. Julian recommended that the claimant take Abilify with an antidepressant until she obtained access to her prescribed medication again. Dr. Julian discontinued Lamictal and prescribed Latuda once again. The claimant requested and received a referral for therapy. (R. 840-43).

In March 2014, the claimant reported a rash and nightmares while on Latuda. She claimed to have stopped taking Latuda and replaced it with her remaining Abilify and Geodon. The claimant reported that Abilify worked well but wore off too early in the day and affected her weight. Dr. Julian discontinued Latuda and prescribed Abilify. The claimant reported very positive progress at her May 2014 appointment. (R. 844-50).

In August 2014, the claimant entered a period of depression partly stemming from the recent death of her boyfriend. She continued to take Abilify during this time but did not attend therapy for two weeks. (R. 851-54).

In November 2014, the claimant reported paranoia, depression, and major mood swings despite consistently taking her prescribed medication. Dr. Julian observed increased depression and irritability and prescribed higher dosages of Abilify. (R. 855-58).

12

In December 2014, the claimant reported increased agitation, auditory hallucinations, and night terrors. Dr. Julian decreased the claimant's dosage of Abilify and added Depakote and Topamax to her medication. (R. 859-62).

At a February 2015 appointment, Dr. Julian recorded that the claimant had trouble filling her Topamax prescription. Her mood was manic because she did not have her medication. At a follow-up in May 2015, the claimant still had trouble acquiring Topamax, and Dr. Julian observed a worsening of the claimant's energy levels, auditory hallucinations, and panic disorder. (R. 863-70).

In September 2015, the claimant told Dr. Julian that she did not have her medication during the preceding three weeks and reported worsening of auditory hallucinations, depression, and panic attacks. She reported improvements while taking Abilify and identified no side effects. Dr. Julian then increased the claimant's Abilify prescription. (R. 871-76).

In October 2015, Dr. Julian recorded that Abilify would no longer be available through the claimant's prescription assistance program, so Dr. Julian switched the claimant to Rexulti. In February 2016, the claimant reported to Dr. Julian that she felt her dosage of Topomax was effective with migraines and weight loss, and Dr. Julian reported that the claimant seemed "OK" but was not taking the prescribed Rexulti. (R. 877-88).

On June 1, 2016, Dr. Julian reported that the claimant felt sedated by her medication during the day and that the claimant believed it caused her to be incontinent. And at a follow-up on June 29, 2016, Dr. Julian believed the claimant's bipolar disorder to be in partial remission, but that the medication might cause mania. Dr. Julian also recorded that the claimant felt the medication worked well but reported falling asleep while driving. (R. 889-95).

*The 2016 ALJ Hearing*

After the U.S. District Court for the Middle District of Alabama remanded the claimant's case, the claimant received another hearing before the ALJ on December 28, 2016. (R. 512). At the hearing, the claimant testified that she lived with her older brother and his wife who financially supported her. The claimant stated that she avoided driving because she frequently fell asleep and had panic attacks at the wheel. And the claimant testified that she largely avoided leaving the home unless she was with her brother or other close family members. (R. 519-22)

The claimant further discussed her educational history. She claimed that she took online classes to pursue a psychology degree but that she struggled with the courses. The claimant testified that she would have high levels of stress when in contact with others in a traditional classroom setting and that she often panicked with short deadlines. She expected to graduate in May 2017. The claimant expressed her desire to potentially help other suicidal people. She estimated that she had $50,000 in outstanding student debt. The claimant testified that she made B's in all her recent classes but that she frequently struggled with test-taking. She claimed to be in a special program that allowed her extended deadlines and extra time for testing. She also testified that she frequently had to ask questions regarding the material and that she only felt comfortable messaging through online means. (R. 522-25, 528-30).

The claimant stated that she was writing a book on the different ways people commit suicide to the disapproval of her family. She testified that she worked on the book when she was manic and that it was "very detailed and gruesome" and that "people shouldn't read stuff like that." (R. 526).

The claimant testified that she recently stopped attending therapy because "they were already telling me stuff I already knew," but that she continued to keep a journal according to her

therapist's advice. She claimed that she continued to see Dr. Julian for medication management and that she took Topomax and Rexulti pursuant to Dr. Julian's orders. When asked about Dr. Julian's finding that the claimant's bipolar disorder was in partial remission on June 29, 2016, the claimant testified that she exhibited partial remission to Dr. Julian only because she was taking Abilify at the time. But she could no longer take Abilify because the program that paid for her medicine stopped providing the drug and she could not afford the medicine on her own. (R. 526-28).

The claimant stated that, after her father became ill, her stress drove her to break her computer that she used for online classes. She testified that she took care of her ill father for a few months and that she did not take her medication during that time. She stated that the Department of Human Resources took her father away because of neglect and death threats made by the claimant. (R. 531-34, 544).

The claimant testified that she obtained most of her medication through a program called Charity Care at UAB. She claimed that she took Abilify in the past, which worked well, but that Charity Care no longer paid for the drug. The claimant testified that she took other medication because she no longer had access to Abilify, but that her new medication did not help her mood swings or auditory hallucinations. The claimant stated that she also took medication for her seizures and that she still saw Dr. Julian for her bipolar disorder. The claimant testified that she regularly has panic attacks caused by simple irregularities like a bad hair day. (R. 534-38).

The claimant stated that she lives with her brother and sister-in-law near Samford University where her brother works and that she prefers to be alone most of the day. She also claimed that she needed to know that someone was nearby to avoid panic. She testified that she used to be social and have friends before her condition set in, but now she avoids most

interaction. She stated that her panic attacks drove her to quit working at the pool and that she is frequently embarrassed when people from her hometown and high school see her in her current condition. The claimant stated that she takes care of her dogs during the day. She also said that she does not interact much with strangers, especially after her brother scolded her for "sleeping around too much." And the claimant testified that she only leaves the house to visit her parents or if someone convinces her to eat out. (R. 538-43).

Next, the claimant's attorney questioned her. In response to his questions, the claimant testified that she had unpredictable outbursts that required her to rock back and forth to calm down. She stated that she still heard screaming voices exacerbated by stress even when she was taking medication. The claimant testified that she had problems with impulsive decisions and that she had a substantial amount of student debt. She claimed that during manic phases her mind darted between tasks and that she became overly ambitious with what she could accomplish. She stuttered frequently during mania and became talkative. The claimant testified that during depressive stages she spent long periods of time alone, avoided bathing, and was incontinent. These depressive stages could last from a week to two months.  (R. 544-51).

The claimant also discussed her paranoia, described how she sometimes becomes suspicious of her family, and testified that she slowly became confused as to what was reality when writing her book. (R. 552).

The ALJ briefly questioned the claimant regarding her other previous employment. The claimant testified that she held a job as an assistant librarian when she was in high school, that she held a job counting money for the summer between high school and college at Robertson Banking Company, that she worked for a short time at a daycare, and that she helped teach swimming lessons for a summer. (R. 555-60).

The vocational expert, Donald Parsons, testified to the type and availability of jobs that the claimant could perform. He considered only the money-counting job as her past relevant work. The ALJ asked Mr. Parsons about the jobs that would be available to a hypothetical person who could only perform light exertional work; could not be around dangerous machinery or tools; could only remember short, simple instructions; could not perform complex tasks; could only make simple work-related decisions; could only have occasional interaction with the public; could have frequent interaction with coworkers; could only have constructive non-confrontational criticism; could accept changes in workplace setting if introduced gradually and infrequently; could not perform at an assembly line production rate pace; and would be off-task five percent of the time during an eight-hour workday. Mr. Parsons testified that such a person could find work as a night cleaner, cafeteria attendant, and routing clerk. (R. 553, 557-63).

The ALJ adjusted the hypothetical to a person who could not interact with the public and only occasionally interact with coworkers. Mr. Parsons claimed that such a person could find work as a routing clerk, merchandise price marker, and night cleaner. The ALJ again adjusted the hypothetical to a person who could not interact with coworkers. Mr. Parson stated that such a person could find no employment. The ALJ asked if jobs would be available for a hypothetical individual who required constant supervision to perform work, and Mr. Parsons stated he knew of no work available for such person. (R. 563-66).

Then the claimant's attorney questioned Mr. Parsons. Mr. Parsons stated that someone with an extreme limitation in an ability to respond to customary work pressures would not be able to maintain competitive employment. He claimed that the same would hold true for someone with marked limitations in customary work pressures. The claimant's attorney asked if the ALJ's original hypothetical person with added marked limitations in ability to deal with

changes in routine would be able to maintain competitive employment. Mr. Parsons testified that marked limitations in ability to deal with change and maintain attention, concentration, or pace would bar competitive employment. Mr. Parsons also testified that, if the claimant was off-task for more than 10% of the time or that if she missed more than one day per month, then she could not find employment. (R. 566-71).

<em>The 2016 ALJ Decision</em>

On June 13, 2017, the ALJ issued a decision finding that the claimant was not disabled under the Social Security Act. (R. 505). First, the ALJ found that the claimant had not engaged in substantial gainful activity since March 18, 2011. Next, the ALJ found that the claimant had the following severe impairments that significantly limit her ability to perform basic work activities: bipolar I disorder, mood disorder, personality disorder, obsessive-compulsive disorder, panic disorder, endometriosis, obesity, obstructive sleep apnea, and asthma. (R. 494).

The ALJ next found that the claimant did not have an impairment that, by itself or collectively, meets or equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. The ALJ evaluated the impairments under Listings 12.02, 12.04, and 12.06. The ALJ focused primarily on the paragraph B criteria in determining that the claimant's mental impairments do not qualify under the Listings. (R. 495).

Pursuant to the Listings' paragraph B, the ALJ evaluated the enumerated areas of mental functioning, observing that one extreme or two marked limitations in the areas of functioning satisfies paragraph B. The ALJ ultimately concluded that the claimant did not satisfy paragraph B and determined her to be "moderately impaired" in all areas of functioning. (R. 495-96).

In the "understanding, remembering, or applying information" area of functioning, the ALJ found that the claimant had only moderate limitations. He observed that the claimant needed

reminders to bathe and take medication, but that she could perform basic household tasks such as preparing simple meals. He also observed that the claimant took classes online and could comprehend the subject matter. The ALJ considered Dr. Blanton's consultative opinion that the claimant had mild limitations in her ability to understand and apply simple instructions and marked limitations regarding complex instructions. The ALJ found Dr. Blanton's opinion to be consistent with the state psychological consultant's view that the claimant could understand and apply simple instructions. (R. 495).

In the "interacting with others" mental area, the ALJ found that the claimant had only moderate limitations despite the claimant's self-reported anxiety around new people and places. The ALJ based his decision largely on the fact that the claimant reported that she had friends and has left the house to go to the beach, as well as Dr. Blanton's opinion that the claimant had moderate limitations when interacting with others but only marked limitations when interacting with supervisors. (R. 495-96).

In the "concentrating, persisting, or maintaining pace" category, the ALJ found that the claimant had moderate limitations as evidenced by Dr. Jackson's opinion and the claimant's reported problems with concentration and her distraction on her consultative mental exam. (R. 496).

The ALJ concluded his paragraph B analysis by finding that the claimant had only moderate limitations in her ability to "adapt and manage oneself." The ALJ observed the claimant's reports of problems handling stress and episodes of depression and mania. He also noted the consultative mental examiner's opinion that the claimant had only moderate limitations in her ability to respond appropriately to usual work situations and Dr. Jackson's opinion that the claimant should have few changes in routine. (R. 496).

19

Next, the ALJ found that the claimant did not satisfy the criteria under paragraph C of Listings 12.04 and 12.06. The ALJ held that the record did not establish "a medically documented history of the existence of the disorder over a period of two years," medical treatment that was ongoing and that diminished the symptoms, or marginal adjustment. (R. 496).

The ALJ found that the claimant had the RFC to perform light exertional work with the following limitations: the claimant could not climb ladders or scaffolds; could not be exposed to dangerous machinery; could perform only simple tasks with simple instructions; could have occasional interaction with coworkers but no interaction with the general public; could take only non-confrontational criticism; could adjust only to small, gradual changes; could not perform assembly line work; and would be off-task 5% of the workday. The ALJ based his RFC conclusion partly on his finding that, even though the claimant's medically determinable impairments could reasonably cause her subjective symptoms, her alleged symptoms were not consistent with the other evidence on the record, especially because she performed well on medication and her condition recently improved with other treatment. (R. 497-500).

The ALJ gave little weight to Dr. Taylor's 2008 evaluation of the claimant, some weight to Dr. Taylor's 2011 letter opining that the claimant was disabled, and little weight to Dr. Taylor's 2013 evaluation of the claimant. The ALJ noted that no treatment records accompanied Dr. Taylor's 2008 and 2011 opinions and that Dr. Taylor's 2011 opinion was largely conclusory. Because the record did not contain any reports of psychotherapy sessions between Dr. Taylor and the claimant, the ALJ concluded that Dr. Taylor was not a treating physician. The ALJ also questioned whether the claimant actually attended psychotherapy with Dr. Taylor as claimed in the 2013 evaluation because the claimant was receiving psychotherapy from West Alabama. According to the ALJ, "[i]t seems inconsistent that the claimant would have been receiving

treatment from Dr. Taylor at the same time that she was going to West Alabama." (R. 500-01).

The ALJ gave good weight to Dr. Blanton's opinions. But the ALJ also found that Dr. Blanton's opinions underestimated the claimant's RFC because the record "demonstrates that the medications result in some improvement in symptoms." Specifically, the claimant's subsequent use of psychiatric medication resulted in decreased mania and panic attacks. The ALJ also gave the claimant's GAF scores good weight because of their consistency with the evidence that the claimant functions better with medication. (R. 501-03).

Though state agency medical consultant Dr. Jackson did not examine the claimant, the ALJ gave Dr. Jackson's evaluation of the claimant's RFC good weight because Dr. Jackson reviewed the entire record and was familiar with the disability program. (R. 502).

Finally, the ALJ found that the claimant had no past relevant work, but that a significant number of jobs existed in the economy at the claimant's RFC, namely a night cleaner, routing clerk, and merchandise price marker. Accordingly, the ALJ concluded that the claimant had no disability under the Social Security Act. (R. 504-05).

## VI. DISCUSSION

The claimant argues that (1) substantial evidence does not support the ALJ's decision to discount the claimant's subjective testimony about her symptoms for not being fully consistent with the record; and (2) the ALJ erred in not giving appropriate weight to the claimant's treating and examining doctors. The court addresses each of the claimant's contentions in turn.

*Issue 1: The ALJ's Analysis of the Claimant's Subjective Testimony*

The claimant first argues that the ALJ erred by finding that the intensity, persistence, and limiting effects of the claimant's subjective symptoms were not fully consistent with the evidence in the record. The ALJ discounted the claimant's testimony because of the claimant's

improvements when receiving treatment and taking medication, non-compliance with taking her prescribed medication, and activities in her daily living. The claimant argues that the ALJ should have accepted the claimant's subjective testimony as true and that substantial evidence does not support the ALJ's reasons for discounting it.

The ALJ must explain the reasons for the weight he gives each item of evidence so the reviewing court can determine whether her "ultimate decision on the merits of the claim is rational and supported by substantial evidence." *Cowart v. Schweiker*, 662 F.2d 731, 735 (11th Cir. 1981). "Although the ALJ does not have to discuss every document in the record separately, 'an ALJ may not select only the evidence that favors her ultimate conclusion.'" *Murphy v. Colvin*, No. 2:13-CV-01237-KOB, 2014 WL 4793446, at *3 (N.D. Ala. Sep. 25, 2014) (quoting *Garfield v. Schweiker*, 732 F.2d 605, 609 (7th Cir. 1984)). And, in reviewing an ALJ decision, the court must view the claimant's record in its entirety and take account of evidence that detracts from the evidence relied on by the ALJ. *Hillsman*, 804 F.2d at 1180.

An impairment is not disabling if medication can reasonably remedy it such that the claimant would be able to work. *Dawkins v. Bowen*, 848 F.2d 1211, 1213 (11th Cir. 1988). So the Regulations "provide that refusal to follow prescribed medical treatment without a good reason will preclude a finding of disability." *Id.* (citing 20 C.F.R. § 416.930(b)). But the Regulations excuse a claimant's noncompliance with taking prescribed medication if the claimant has "good reason" to not take the medication. 20 C.F.R. § 416.930(b). The Regulations do not explicitly list a claimant's inability to pay as an example of a "good reason" to not take prescribed medication, but the Eleventh Circuit has found that "poverty excuses noncompliance"; *i.e.*, "[i]f the ALJ finds that [the claimant] is disabled and cannot afford the prescribed treatment, then she is excused from not complying and she is entitled to benefits."

*Dawkins*, 848 F.2d at 1213–14.

Also, if the ALJ determines that medication could reasonably treat the claimant's symptoms, then the ALJ must consider any side effects from that medication. 20 C.F.R. § 416.929(c)(3)(iv).

In this case, the ALJ relied on evidence in the record that supported his decision but disregarded substantial evidence that detracted from his decision. The ALJ correctly observed that, at the last recorded session at UAB's psychopharmacology clinic on June 29, 2016, Dr. Julian reported that the claimant felt that her medication was working well, that the claimant had better energy, mood, sleep, and lifestyle, and that the claimant's bipolar disorder was in partial remission. (R. 893-95). But the ALJ erroneously failed to consider that the June 29, 2016 appointment with Dr. Julian was the first time that UAB found the claimant in partial remission, that Dr. Julian stated that the claimant may have further medicine-induced mania, and that the claimant still reported falling asleep while driving at that appointment. (R. 895).

Also, the ALJ's decision seems to ignore the fluctuations in the claimant's treatment progress or simply ties the claimant's fluctuating progress to her inconsistent compliance with taking her medication. Indeed, from 2013 to 2016, the claimant's condition both worsened and improved sporadically as she experienced extreme mood swings between prolonged bouts of depression and mania. Although the claimant's condition did generally improve with treatment, the medical records described above demonstrate that her condition is largely contingent on medication. Relying on this evidence, the ALJ found that the claimant's prescription medication would control her symptoms enough for her to be able maintain employment at her RFC, and that only the claimant's own noncompliance with taking her medicine prevented her from improving.

But the ALJ erroneously failed to consider the claimant's inability to pay for her medication as an excuse for her noncompliance. As stated above, the ALJ must consider whether the claimant's inability to pay for her prescribed medication excuses her noncompliance. *Dawkins*, 848 F.2d at 1214. The claimant testified that she no longer had access to Abilify after Charity Care stopped providing it and she could not afford the drug on her own. And several treatment records from UAB document her inability to pay. The ALJ did not consider this evidence when discounting the claimant's testimony based on her failure to take her prescribed medication. So, under *Dawkins*, the ALJ committed reversible error. *See also Parten v. Colvin*, No. 2:14-cv-1212-TFM, 2016 WL 791492, at *8 (M.D. Ala. Feb. 29, 2016) (the Middle District stating on appeal of the claimant's first denial that the "failure to address financial resources and ability to seek treatment also constitutes legal error which merits remand").

Also, the ALJ failed to appropriately consider the troublesome side effects caused by some of the claimant's medication. When discussing the claimant's treatment, the ALJ remarked that the claimant's doctors often switched her between medications because of side effects, but the ALJ hardly discussed or considered how the record indicates that many of the claimant's medications were ineffective or caused side effects like incontinence and potential mania. In other words, the ALJ found that the claimant was not disabled because medication could treat her symptoms but disregarded the substantial evidence that could show that serious side effects preclude the claimant from taking certain medication. So substantial evidence does not support the ALJ's decision to discount the claimant's subjective testimony on the basis that her symptoms improved with medication.

The ALJ also discounted the claimant's subjective testimony because the ALJ found the claimant's version of her limitations to be inconsistent with her activities and other testimony.

Specifically, the ALJ noted that the claimant took online classes; she had a dog; she occasionally cleaned; she reported in 2013 that she liked to listen to her friends play music; she took care of her father; she was trying to eat healthier; and she recently went to the beach with her parents. (R. 499-500). But no "reasonable mind might accept" that being able to take online classes, having a dog, occasionally cleaning, listening to friends play music, trying to eat healthier, and once going to the beach—evidence of a handful of good days—is inconsistent with the substantial evidence that shows the claimant experiences unpredictable and extreme mood swings between prolonged periods of mania and depression. *See Richardson*, 402 U.S. at 402. So substantial evidence does not support the ALJ's reasons for discounting the claimant's subjective testimony based on some of the claimant's activities.

Also, the ALJ did not consider the full picture of the claimant's activities. For example, the claimant demonstrably struggles with online classes. She requires special accommodations, takes one class at a time, and failed out of the University of Phoenix because of her poor GPA. Likewise, when the ALJ considered that the claimant takes care of her father, he failed to mention that the claimant threatened her father's life or that DHR took him away. So, while some evidence supports the ALJ's conclusion that the claimant's schooling and caring for her father weighs against finding a disability, the ALJ did not consider or mention her major difficulties with these activities. So, again, substantial evidence does not support the ALJ's decision to discount the claimant's subjective testimony as inconsistent with some of her activities.

For the reasons stated above, substantial evidence does not support the ALJ's decision to discount the claimant's subjective testimony because the ALJ did not (1) consider the claimant's inability to pay for medication; (2) sufficiently consider the side effects of the claimant's

medication; (3) find with sufficient evidence that the claimant's activities contradict her testimony of her symptoms; and (4) sufficiently consider the claimant's difficulties with her activities. The court will reverse the ALJ's decision and remand for these reasons.

*Issue 2: The ALJ's Consideration of Medical Opinions*

The claimant next alleges that the ALJ did not give proper weight to the findings of the claimant's treating and examining physicians, Dr. Taylor, Dr. Blanton, and Dr. Atkins. The claimant further asserts that, had the ALJ given appropriate weight to these sources, the ALJ would have held that the claimant met Listing 12.04 or would have found a more limited RFC. The claimant also argues that the ALJ should have discounted Dr. Jackson's testimony because good cause existed to do so. The court analyzes each of these claims in turn.

As stated above, under 20 C.F.R. § 416.927(c)(2), the ALJ must give a treating physician's opinion testimony "controlling weight" if the testimony is both well-supported by medically-acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the case record. The ALJ also must give medical opinions of treating sources "substantial weight" unless (1) evidence did not bolster the treating physician's opinion; (2) evidence supported a contrary finding; or (3) the treating physician's opinion was conclusory or inconsistent with the doctor's own medical records. *Winschel*, 631 F.3d at 1179. An ALJ may discount both conclusory opinions from a treating source and opinions not accompanied by objective medical evidence. *Crawford v. Commissioner*, 363 F.3d 1155, 1159 (11th Cir. 2004). And the ALJ must articulate specific reasons supported by substantial evidence for discounting treating and examining physicians. *Moore*, 405 F.3d at 1212.

1.    Dr. Taylor's Opinions

The ALJ gave treating psychologist Dr. Taylor's medical opinions little to some weight.

26

(R. 500-01). The ALJ found that Dr. Taylor's 2008 psychological evaluation of the claimant in which Dr. Taylor noted the claimant's untreated bouts of panic, depression, mania, rages, and suicidal and homicidal ideations was outdated, lacked accompanying medical records, and was inconsistent with the rest of the record. The ALJ also found that Dr. Taylor's 2011 letter opining that the claimant was "totally and permanently" disabled lacked accompanying relevant medical records, relied on the outdated 2008 evaluation, and was conclusory. The ALJ also observed that no medical records accompanied Dr. Taylor's 2013 Medical Source Opinion form and the form did not identify on which psychological evaluation Dr. Taylor relied. For the following reasons, substantial evidence supports the ALJ's decision to assign little to some weight to Dr. Taylor's opinions.

First, substantial evidence of the claimant's modest improvements over time since Dr. Taylor's 2008 evaluation supports the ALJ's decision to consider the evaluation outdated. Several records of the claimant's visits with Dr. Julian from 2013 to 2016 show that the claimant's condition improved when properly medicated. The claimant's condition presented itself to Dr. Julian in 2008 differently than it later did during several years of treatment. So substantial evidence supports the ALJ's decision that the 2008 medical opinion is inconsistent with the rest of the record and the ALJ did not err in denying Dr. Taylor's 2008 opinions controlling or substantial weight.

Next, the conclusory nature of Dr. Taylor's 2011 opinion that the claimant was "totally and permanently" disabled constitutes substantial evidence to support the ALJ's decision to afford the opinion only little weight. A claimant is not disabled under the Social Security Act merely because a medical source conclusorily says so. *See* 20 C.F.R. § 416.927(d)(1). And Dr. Taylor based his conclusion only on his 2008 evaluation of the claimant, which, as the court

27

explained above, the ALJ properly afforded little weight.  So Dr. Taylor's 2011 opinion is only a conclusory statement not supported by the rest of the record that the ALJ properly denied controlling or substantial weight.

Finally, an ALJ may deny controlling or substantial weight to a treating doctor's opinion if objective evidence does not accompany it. *See* 20 C.F.R. § 416.927(c)(2); *Crawford*, 363 F.3d at 1159. As the ALJ stated, Dr. Taylor did not identify on his 2013 Medical Source Opinion form any examination on which he relied.  So the ALJ articulated valid reasons supported by substantial evidence for discounting Dr. Taylor's findings.

2.    Dr. Blanton's Medical Opinions

As stated above, Dr. Blanton opined as to the claimant's RFC in 2012, but the ALJ found that Dr. Blanton somewhat underestimated the claimant's RFC and thus afforded Dr. Blanton's opinion good, but not substantial, weight. Substantial evidence supports the ALJ's decision because Dr. Blanton was only an examining physician, not a treating physician, and an ALJ does not have to give substantial or controlling weight to an examining physician. *See Winschel*, 631 F.3d at 1179. And the ALJ articulated valid reasons for the weight he gave to Dr. Blanton's opinions; the ALJ specifically noted that other medical records showed that the claimant's condition could improve with the appropriate medication and treatment such that the claimant's RFC could be less limited than that opined by Dr. Blanton. So substantial evidence supports the ALJ's decision to give Dr. Blanton's opinion good weight.

3.    Dr. Atkins's Medical Opinions

Though the ALJ discussed Dr. Atkins's findings, the ALJ did not state the weight he gave to the many notes that Dr. Atkins took as the claimant's treating psychiatrist from 2008 to 2011. So, because an ALJ must state with particularity the weight he gave different medical opinions

28

and the reasons for doing so, the ALJ erred by not stating the weight he gave to Dr. Atkins's opinions. *See Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987).

    4.    <u>Dr. Jackson's Medical Opinions</u>

Finally, the claimant challenges the good weight that the ALJ gave to Dr. Jackson's opinions. According to the claimant, the ALJ did not have good cause under *Winschel* to give Dr. Jackson's testimony less than substantial weight. But the *Winschel* "good cause" test applies only to *treating* sources. *Winschel*, 631 F.3d at 1179. Dr. Jackson is a *non-examining* source, so the ALJ did not have to articulate good cause under *Winschel* to give Dr. Jackson's opinions less than substantial weight. And substantial evidence supports the good weight given to Dr. Jackson's opinion because, as the ALJ stated, Dr. Jackson reviewed the entire record and relied on her familiarity with the Social Security Act's disability requirements. So the ALJ did not err in giving good weight to Dr. Jackson's opinions.

## VII. CONCLUSION

For the reasons stated above, the court finds that substantial evidence does not support the ALJ's decision to discount the claimant's subjective testimony of her symptoms because the ALJ did not (1) consider the claimant's inability to pay for medication; (2) sufficiently consider the side effects of the claimant's medication; (3) find with sufficient evidence that the claimant's activities contradict her testimony of her symptoms; and (4) sufficiently consider the claimant's difficulties with her activities. The ALJ also erred by not stating the weight that he gave to Dr. Atkins's opinions as a treating psychiatrist. But the ALJ did not err in the weight given to the opinions of Dr. Taylor, Dr. Blanton, and Dr. Jackson.

So, by separate order, the court will REVERSE and REMAND the decision of the Commissioner for further action consistent with this opinion.

DONE and ORDERED this 5th day of March, 2020.

**KARON OWEN BOWDRE**
UNITED STATES DISTRICT JUDGE